[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION (on application for Family Violence Education Program)
The defendant in this case, nineteen year old, Peter S. Weiss, is the son of an attorney and the grandson of an attorney and he is employed as a special deputy sheriff in Windham County. While these factors might at first appear to work in the favor of the defendant, these two facts have, paradoxically, created hardships for him as they relate to the disposition of this case.
Peter S. Weiss happens to be employed as a special deputy sheriff in the Windham County Sheriff's Department at a time when that very agency is under siege by criminal investigations and arrests and by calls for reform of the sheriff's office. As a consequence his arrest has already achieved some local notoriety. In a sense, his employment further victimizes him in this particular case. If Peter Weiss did not have lawyers in his lineage and currant employment in the sheriff's office, his spontaneous and unfortunate conduct would have likely made him an immediately qualified, and very typical, candidate for a pre-trial diversionary program as a first time offender not likely to offend in the future. His entry into a diversionary program would have been with the same degree of anonymity attendant to most other applicants. CT Page 2360
Peter's parents have recently separated and filed for divorce. This is an emotionally challenging event for any child of divorcing parents no matter what the age. The reasons for the separation and divorce are not common knowledge. It is common knowledge and undisputed however, that Peter's mother, Claudia Weiss, is now frequently in the company of another attorney, Steven St. Clair. It can be reasonably inferred from the arrest warrant that young Peter was in some measure distraught by his perception that his mother had problems with alcohol and that attorney Steven St. Clair was contributing to his mother's problem. Whether Peter believed St. Clair was a precipitating factor in the divorce of Claudia and Martin Weiss is not known. The following facts are alleged in the affidavit and warrant charging Peter Weiss with the recent criminal conduct which gives rise to the present application for participation in the family violence education program.
 I. The Warrant
Steven H. St. Clair, stated that on November 14, 1999 at approximately 6:20 p. m., he arrived at his friend Claudia Weiss' house on 168 W. Quassett Road, Woodstock. He stated when they pulled into the driveway about 5 or 10 seconds later a vehicle pulled behind them. "St. Clair stated Claudia got out of the vehicle to see who it was and it turned out to be her son, Peter Weiss. [they] then walked into the house and he shut his vehicle off and went into the house . . . on his way into the house he said hello to Peter who he had met on only one other occasion. . . . Peter walked into the kitchen and did not say anything to him but walked over to the refrigerator and took out three full beer bottles which were still in the cardboard container. . . Peter then walked out of the house and he went to the refrigerator and got a beer. St. Clair put the beer down on the counter because he was looking for a can opener. St. Clair stated he then picked the beer up again and that is when Peter came back into the house through a patio door in the kitchen. St. Clair stated Peter walked over to him and grabbed his beer right out of his hand and then walked to the other side of the center island counter. St. Clair stated he then said to Peter "what are you doing, that's my beer?" St. Clair stated Peter then smashed the beer bottle on the kitchen floor and started walking towards him saying "you better get the f,,, out of here or I'm going to kill you." St. Clair stated Peter then started punching at his head with his fist and he was moving forward to try and avoid CT Page 2361 getting hit. St. Clair stated Peter then threw him down on the kitchen floor and kept punching at his head . . . . (St. Clair) was then able to drive himself to Day Kimball Hospital. The affiant [police officer] observed `a minor approximate 1/4" cut on the left forearm of the victim and some redness on the left side of the victim's head."
Peter Weiss stated that at approximately 6 p. m., he went over to his mother's, Claudia Weiss, house to check on the family pets. "The accused stated when he arrived nobody was home so he went into the house and checked on the pets and then left. The accused stated as he was leaving and driving down W. Quassett Road that he saw a car pass him on the opposite side of the road and his mother was in the passenger seat. The accused stated his friend Bill turned their vehicle around and went back to the house because he wanted to talk to his mother and also see who she was with. The accused stated Bill pulled into the yard behind their vehicle. The accused stated his mother got out of the car first and the guy she was with stayed in the car. The accused stated he then recognized the guy in the car as Steve, a guy his mother introduced him to on Saturday. . . . The accused stated when he walked into the kitchen his mother and Steve were standing around in the middle of the kitchen talking. The accused stated he then walked over to the refrigerator to see what kind of booze was in there and there was a six pack container of Molson Ice with three full beers left. Peter stated he took the beers out of the refrigerator and brought them out to Bill's car. . . . Peter stated when he went into the kitchen he opened up the refrigerator again but did not see any more beer. . . . Peter then stated he told Steve to "get f. . ." and Steve stepped towards him and tried to punch him in the head. Peter said he stepped away and the punch missed him and he dropped the bottle of beer he was holding on the floor and put his fists up and went towards Steve and began throwing punches at him. Peter stated he thinks he hit him three or four times in the face before his fell to the floor. Peter stated once on the floor Steve started throwing punches at him and Peter's mother jumped on his back and screamed "stop you b . . . ., your (sic) hurting him, get off of him.". Peter stated that once Steve stopped throwing punches at him, he got up from being on top of Steve and took a couple of steps back in case he tried to come at him. . Peter stated he drove over to the house with his friend Bill Gadbois. Peter also added he did not go back to his mother's house with the intent to start any trouble but when Steve tried to punch him, he acted in self-defense to protect himself. CT Page 2362
William J. Gadbois stated, ". . . his best friend Peter Weiss asked him to go with him to his parents residence to feed the dogs . . . . upon arrival at the residence there was no one home. As Peter opened his parents patio door with his key, the alarm went off. Gadbois stated Peter then fed the three dogs and they both left . . . when they were leaving on W. Quassett Road, they passed a Nissan Pickup truck going the opposite direction with Claudia Weiss as the passenger. . . . Peter asked him to turn around and follow them so he could ask his mom if she was going to take care of the dogs . . . they followed the pickup truck to the Weiss residence and pulled into their driveway. . . Claudia stepped out of the pickup and Peter stepped out of his vehicle to talk to her. Gadbois stated a white male approximately 45 years of age, glasses and grey hair stepped out of the pickup truck and three of them went into the house through the garage entrance . . . . approximately five minutes later, Peter came out to his truck with a six pack of beer bottles. . . . Gadbois stated from talking to Peter his intention was to get the booze out of the house to stop his mother from drinking it Peter then went back into the house through the garage, followed by Peter and Claudia. . . . Peter told the male to leave immediately and not to ever bring booze into the house. Gadbois stated the male did not leave immediately and Claudia began screaming at Peter, calling him a b . . . . d . . . . and a lunatic . . . Claudia then slapped Peter in the face with both of her open hands about three times while repeating you're an animal, a lunatic and a b . . . . d . . . . it appeared to him that Claudia was intoxicated because she was losing her balance and her speech was sloppy as if slurred. Gadbois stated Claudia finally stopped hitting and yelling at Peter and Peter then yelled to the male to leave.
Based upon the statements in this affidavit, a warrant was obtained for the arrest of Peter for assault in the third degree and disorderly conduct. The warrant was personally signed by the Windham County State's Attorney. Shortly after the arrest. Attorney St. Clair wrote letters to the victim's advocate and to this judge, ex parte, challenging the lack of severity of the charges,[1] that is, that Peter was not also charged with threatening, requesting a transfer to another judicial district for prosecution, and also "vigorously opposing and objecting to accelerated rehabilitation by the defendant" and stating that he will "vigorously oppose and object on legal and other grounds to any suggestion that this matter belongs in the Family Violence CT Page 2363 Program. . ."
On January 6, 2000, the court (Foley, J) denied the defendant's motion to dismiss the charges. On February 9, 2000, upon the application of counsel for the defendant, the court (Potter, J.) referred the matter to the family violence intervention unit for an evaluation of whether this case was an appropriate referral to the family violence education program. The court (Potter, J.) knew of, and on November 24, 1999, had mediated issues relating to a protective order issued at the request of Claudia Weiss under the family violence statute sec. 46b-38c(e), which protective order also extended to Steven St. Clair. It was the defendant's mother who initially invoked the family violence statute as applicable and appropriate claiming victim status for her protection and that of her friend, Steven St. Clair.
On February 17, 2000, the case again appeared on the docket with a recommendation from the family relations officer that the family violence education program be granted. The report states that Peter has been attending a five week anger management course through his Employee Assistance Program. The report recommends that the family violence education program be granted, that the defendant attend certain counseling and pay all unreimbursed medical bills incurred as a result of this incident.
Steven St. Clair and Claudia Weiss appeared and were given the opportunity to be heard as victims. St. Clair indicated his unequivocal opposition to the program being granted, calling the incident a "premeditated and unprovoked attack." Both he and Peter's mother submitted letters in opposition to granting the program and a copy of a medical report regarding the medical treatment of St. Clair.[2] Attorney St. Clair stated to the Family Relations Officer that ". . the degree of rage he experienced from this defendant has traumatized him both physically and emotionally." Peter's mother, Attorney Weiss, in her letter to the Family Relations Officer stated: "[A}s a family law practitioner almost exclusively for the past twelve years I know that this was not family violence." (Bold in original)
While the court is mindful of the personal trauma and injuries Attorney St. Clair received in this incident, it is quite difficult to understand the complete lack of sensitivity to the intimate family issues, in particular the "rage," involved between his self-described "significant other," Claudia Weiss, and her son. What is equally vexing is that Claudia Weiss, CT Page 2364 herself, joins St. Clair in resisting a rehabilitative program for her son, Peter. Neither seem to have any hesitance to make this a matter of general public knowledge. They do not see this as an appropriate case for rehabilitative or restorative justice but rather, believe that retributive justice through criminal prosecution is appropriate.[3] The court disagrees.
 II. Overview of pre-trial diversion
"It has been suggested that `pre-trial diversion' programs[4]
reduce the risk of recidivism for first time offenders, enable a defendant to preserve his community and family ties, and help reduce court backlogs." (Footnote added.) Commonwealth v.Duquette, 386 Mass. 834, 438 N.E.2d 334, 341 (1982). "Pretrial diversionary programs are premised on the belief that it is not always necessary, and in fact, may often be detrimental, to pursue formal courtroom prosecution for every criminal violation."[5] Annot., 4 A.L.R.4th 147, 151 (1981). These programs "are alternative procedures to the traditional process of prosecuting criminal defendants and are intended to augment the criminal justice system where prosecution would be counterproductive, ineffective, or unwarranted." Id., 153.
A federal task force reported that "for many lesser and first offenders, full exposure to criminal justice processes and formal correctional treatment may only contribute to the possibility of recidivism. Labeled as . . . criminals, cast among hardened offenders in jails and prisons, separated in many cases for weeks or months from, jobs, school, and other important institutions in the normal community, persons may be confirmed in crime who would otherwise have returned to law-abiding ways."[6] A. Campbell, Law of Sentencing (2d Ed. 1991) § 15:3, p. 372-73. "Pretrial diversion programs deflect defendants from conventional corridors of the criminal courthouse and into programs that directly achieve the sentencing goals of rehabilitation, community integration, and individual deterrence. Where appropriate, they avoid time, expense, uncertainty, and the stigma associated with full blown criminal prosecutions." A. Campbell, supra,. 372. Massachusetts has a pretrial diversion program entitled a "continuance without a finding." See Commonwealth v. Duquette,
supra, 438 N.E.2d 340. The court describes this program as "a procedure which often serves the best interests of both the Commonwealth and the defendant. The benefit to a defendant is obvious: he maybe able to avoid a trial and `earn' a dismissal of the indictment of complaint, thereby avoiding the consequences of CT Page 2365 having a criminal conviction on his record. These advantages would be especially appealing to a first offender or a defendant whose job security or family situation might be threatened by a conviction. The Commonwealth avoids the more time-consuming process of trial and sentencing." Id., 340-41.
"Diversion is traditionally justified on three grounds: the conservation of judicial resources; the reduction of recidivism by placing the offender in a community-based treatment program so that he may be rehabilitated free of the stigma of a criminal conviction which might act as a self-fulfilling perception encouraging him to act out his social role as a criminal; and the avoidance of an unduly harsh punishment in the case of the marginal offender who may have the course of his life profoundly influenced by the attachment of criminal status." A. Spinella, Connecticut Criminal Procedure (1985) § 9, p. 602.
 III. The Pretrial Family Violence Education Program § 46b-38c
The court is frequently called upon to make referrals of cases to the family violence intervention unit in many cases that do not, strictly speaking, fall within the precise definition of the statute. It is often difficult, even inappropriate, to inquire into the precise nature of relationships of unmarried persons to one another. This is especially true when the inquiry is sought to be made after the emotional upheaval of a domestic altercation. With respect to a statute such as this, which is intended to be broadly remedial, the court and the family relations officers who are called upon to evaluate these matters, generally exercise considerable latitude in determining whether a case is suitable for the program. The court and the family relations officers are frequently very generous in granting the program to first time offenders who do not appear to be likely to re-offend and who are willing to participate in a community based program of counseling and education. Among other things, the counseling is to explore the nature and causes of family violence.
In this case, the defendant is a nineteen year old young man, the episode involves his mother in his mother's home, he has no prior family violence conviction, and the other victim is the "significant other"[7] of his mother. The altercation giving rise to these criminal charges arose precisely because of perceived problems between the mother and her son attendant with his mother's divorce. It was the defendant's mother, Claudia CT Page 2366 Weiss, who first invoked the protection of the family violence statute when she declared herself and her friend to be victims and sought protective relief under the provisions of 46b-38c(e), not withstanding her subsequent disclaimer that this is not "family violence."
Indeed, section 46b-38a(2)(B) defines parents and their children as within the contemplation of the statute. It is just these matters that lend themselves to a program designed to prevent the recurrence of anger, rage and hostility between family members, as well as those in close interpersonal relationships with family members. Many family members involved in the after-math of separation and divorce may be self-absorbed and unable to objectively understand how their own conduct may be contributing to behavior that creates an atmosphere conducive to family violence. Unfortunately, the statute does not permit the court to order counseling for all persons involved in these unfortunate cases — only those arrested.
 ORDER
Based upon the duly executed application and the recommendations of the Family Relations Officer, the court finds (1) That the defendant has not previously been convicted of a family violence crime; (2) the defendant has not had a previous case assigned to the family violence education program; (3) the defendant has not previously invoked or accepted accelerated rehabilitation under section 54-56e for a family violence crime which occurred on or after October 1, 1986; and (4) that the defendant is not charged with a class A, class B or class C felony, or an unclassified felony carrying a term of imprisonment of more than ten years. The court orders the defendant to be released to the custody of the family violence intervention unit until October 17, 2000 as recommended. The defendant shall complete the family violence education program. The defendant shall attend such counseling as the intervention unit may direct. The defendant shall pay for any and all medical bills incurred as of this date, by the victims, that are not covered by medical insurance which resulted from medical treatment as a consequence of this incident. The defendant shall forthwith pay the fee of two hundred dollars for program participation.
If the defendant satisfactorily completes the family violence education program and complies with the conditions imposed for the period set by the court, he may apply for dismissal of the CT Page 2367 charges against him and the court, on finding satisfactory compliance, shall dismiss such charges. Upon dismissal, all records of such charges shall be erased pursuant to section54-142a.
Judgement may enter accordingly,
Foley, J.